And I want to thank Judge Fitzwater for loaning us his courtroom, and I want to thank Pam for making the trip, carrying all the stuff that we need to put on. There's more that you would think. You think you're just arguing, but in fact, there's all this equipment that is needed, and I appreciate everybody's efforts to make that happen. I think y'all are very familiar with our system. We have the red light system, and it followed y'all to Dallas, so you're still stuck with it. When the yellow light comes on, of course, you've got two more minutes. When the red light comes on, you need to stop, unless we're asking you questions, because if we're asking you questions, you can't avoid them by the red light. So with that, we'll call case number 17-70008, Thompson v. Davis, and we will hear first from Mr. Landers. Thank you, Your Honor, and may it please the court. Despite all of the procedural arguments and questions in this case, everything really comes down to two issues. Number one, is there a Messiah Sixth Amendment violation at Thompson's punishment retrial? And number two, is there a cause for the failure to raise that issue in the initial habeas, state habeas proceedings? I would point out that I refer to the initial state habeas proceedings, because although there was an A and a B writ, there was only one ruling, because, of course, we had the punishment retrial based on the previous Messiah violation. And they held the other waiting for that? Yes, Your Honor. So there really, in my mind, haven't been three state habeas proceedings. There have just been two. And, of course, this court has already pointed out in the prior decision in this case, the relative framework, legal framework for the Messiah claim, which is where I'd like to begin with the court's permission. We framed the COA as two questions, but I take it you had argued there really is only one, it collapsed into one question. The Brady claim is important for one issue, and that's to establish cause and prejudice. And the harm from the Brady claim would be if there is a Messiah violation, of course, Robin Rhodes' testimony and the Hit List don't come into trial. And so I believe if we answer the two questions, is there cause for the default, and is there a Messiah violation, then we can also answer all the other procedural issues that come along with this case in its current form. This court's already pointed out that in order to show a Messiah violation, you must show the Sixth Amendment has attached, that a government agent seeks information without counsel being present, and that we have deliberate elicitation. The district court denied this claim based upon one reason, which is the idea there's not proof that a government agent specifically told Robin Rhodes to seek out information from Mr. Thompson. In my mind, and when I read the relevant Supreme Court cases, it's not clear that there has to be specific instruction from a government agent in all cases. This court in Creel v. Johnson accepted the test as formulated by the district court in that case, which is that an informant was reasonably led to believe or received a benefit, and whether he acted pursuant to instruction from the state or otherwise submitted to state control. Interestingly, Creel v. Johnson did not decide the issue of whether or not you have to have both of those things. That's in footnote nine, I believe. But taking... Okay, but the problem with your rule is it's a little bit vague, and I really think that very few people in prison are not aware that if they're in prison or they're being held pending a lesser charge and they can help the government convict somebody of murder or a greater charge, that they want to spill. And there's a lot of people that become informants simply sitting in prison, never having dealt with the government before. So I don't find that to be some secret that only Mr. Rhodes knew, that, hey, if I find something out about this guy Thompson, I'll get a benefit out of it. So your rule would kind of blur that and make it any time somebody has maybe had a prior contact with the government and also realizes that, hey, I can get a better benefit by telling on this guy, that's good enough. That seems to broaden the rule hugely. Well, I would agree that a first-time informant... Many of the cases that are cited by the respondent are first-time informants who have not had formal agreements, who whenever they are reaching out to defendants do not expect to use that information at the time. I would agree that your run-of-the-mill, average first-time informant, first-time in jail or prison gathering information is not a Sixth Amendment problem. That's why I believe the government agent question is the important question. To the extent that direction is necessary, I think it comes from the government agent prong, according to this court's case law, as opposed to deliberate elicitation. Because deliberate elicitation is, we know that's here, we know that's... Robin Rhodes tells the trial, he goes to Mr. Thompson, he makes himself available. So we have to look at the government agent question. And according to Krilvers-Johnson, was there evidence that Rhodes was otherwise submitting to state control? I mean, I just put it to a different way. I don't hear a lot of discussion going on about the basic teaching of the Supreme Court in Cobb, that the index is whether you are being hustled with regard to the offense charged. And if it's a different offense, then you don't have a Messiah problem. Yes, sir. One thing, if you read Messiah, Henry, Maine v. Moulton, and then you read Cobb, and I believe there was one prior case, McNeil v. Wisconsin, you realize there's a difference in Supreme Court precedent when you have an informant in jail who the defendant has no idea is a police informant. There's a difference between that and when you get to Cobb, where you have someone who's charged for one crime, even if it's related to another, the police come and interrogate. These are police officers in both of those Supreme Court cases, Cobb and the Wisconsin case, the officers show up, everybody knows they're police officers, they read Miranda, and then statements are made. The Supreme Court seems to have dealt with these differently. I would point out that in U.S. v. Henry, the Supreme Court tells us that the knowing and voluntary waiver does not apply in the context of an undercover agent. The Court said the defendant's Sixth Amendment right to counsel attaches only to the offense of which he's charged, I'm quoting, not to other offenses closely related factually to the charged offense. Yes, sir. Only those offenses that even if not formally charged, they're considered the same offense under the Blockburger test. I would address that in two ways, if I may. In Maine v. Moulton, that's the case where you have these guys that are stealing cars, you have co-defendants. One of the co-defendants, Mr. Moulton, while on the phone with his other co-defendant, brings up this plan to kill a witness. It's on a phone call. At that time, his co-defendant goes forward and makes a deal with the police to become an informant and starts recording these conversations. The district court in that case, according to Maine v. Moulton, found that the deal was made, this deal with the government and the informant, was made for the purpose of gathering information about the killing of the witness. But then whenever they get together, the informant and the agent, they also discuss the underlying case. And in Maine v. Moulton, the Supreme Court decided that was still a Sixth Amendment violation. And the reason that's important for our case is even to the extent this started out as an investigation into the solicitation, we know for a fact from Rhodes' testimony and more importantly from the memorandum provided only after, from the DA's office, after federal habeas began, that Rhodes specifically was speaking to Thompson about the solicitation of capital murder. We know that from both his testimony. We also know, although it's never been turned over, and this is clear from the memorandum that's included in our record excerpts from the DA's office, it's clear that there was also, Rhodes was taking written notes after his conversation with Thompson about the actual capital murder, not the solicitation of capital murder. While we're on the subject, I think there is relevant information that is in these recently disclosed documents that also lean to your question or provide us with more insight. One thing I would point out, and I realized this last week as I was preparing for this, this hit list that comes in at the second trial, it's got a fingerprint on it that belongs to Thompson, that is actually submitted in the original solicitation of capital murder police report. Rhodes' testimony in the second trial is directly related to what Mr. Johnson, Detective Johnson, spoke about at the first trial. Importantly, by the time Rhodes gets that hit list, Thompson is under indictment for the original solicitation. But in any event, oh, I'm sorry. That assumes that you can only have one solicitation of murder. I mean, wasn't the solicitation with Johnson arguably a separate crime for soliciting some other guy to do something? So it's not, okay, on October 30th, we need to murder Ms. Zernia, so I need help with that, and then he asks two different people. He asks this one guy, tries to set that up, that doesn't work. Then he does it with a separate guy. That's a separate crime. I recognize that argument, Your Honor. My response would be twofold. Of course, number one, Rhodes' involvement in this case was not just that solicitation. He testified about facts from the capital murder itself, the actual capital murder of Ms. Zernia and her new boyfriend, Mr. Cain. He also... I thought Zernia was the witness. I'm sorry. You're right. Ms. Haislip, I apologize, Your Honor. So he specifically speaks to Thompson about the underlying capital offense, number one. And number two, the way this is used at trial is interesting. It's used as if there's one solicitation. We have the exact same witnesses from the first trial, or at least spoken about. We have, I think it's Maxie Cox is one of the guys that's in jail there. We have discussions of the same... We don't have the same one as the other Rhodes and testified the first time. I know, but in the testimony, you hear the same names come up. Oh, that's right. I'm sorry. So if you look at the first trial punishment phase, the second trial punishment phase, it's the exact same initial witnesses from the jail that are discussed by the police. It's Detective Pinkins, the same person that was investigating the first solicitation case. And then what they do, they even ask Rhodes, do you remember this person? And he shows him the picture of Mr. Cox. They basically insert him in to Detective Johnson, the DA investigators, role. They don't separate between two separate solicitations. That's why Rhodes' testimony is so important, because Ms. Zernia testifies and Detective Pinkins testifies, but they don't have the hit list in yet. And whenever you read their testimony, which becomes first, you have no idea what the state is trying to present the jury at that point. If you didn't know about the first trial, you don't know what they're getting at there. But you know that, well, that's a little bit difficult to analyze because if they didn't have Rhodes, they might have been more fulsome with the other witnesses. So obviously you put a trial together based on what you think you have at the time, and it changes when you don't have that. That's a separate question. Let me ask you this along the lines of kind of the two crimes. Now let me ask you about the term agent. You know, if I hired you to represent me in a car wreck, you would be my agent in that case, but you wouldn't be my agent to go sell my house or to act on my behalf in some other capacity. So even if we were to construe that contract from 1993, which was long since over, as somehow continuing, that was a drug deal contract. Does that make him an agent for everything under the sun if he was an agent for drug deals only? I think you have to look at all the facts that we know from the trial and from what's been disclosed post-trial to answer that question. And if I may, I would point out that this contract starts out as a drug deal contract. You'll also recall that Rhodes' testimony is he initially approaches Thompson about narcotics transactions. You'll see that in some other handwritten notes from the DA's office as well. So his initial approach is exactly what his contract called for, 100%. The court has already pointed out some important pieces of information from this contract. Number one, at trial we learned about Floyd Winkler. Of course, defense counsel didn't know that the same contract had been signed by Floyd Winkler. That had been his handler for five years at that point. And the way that this entire thing goes down is it follows the way the contract works. Number one, this court's already recognized, Robin Rhodes has kind of an open contract. He's kind of a roaming informant. He's tasked with finding drugs and that's it. They don't tell him where to go. They don't tell him what to do. But he must follow Winkler's instructions. Also, he must contact Winkler every day or as instructed. And we know from the trial testimony that he speaks with Thompson, he contacts Winkler, and then he gets this note in hand. I'd like to point out a few more things that are important from the recently disclosed documents. From the Mike Kelly, the DA investigator memorandum. We know that, as I discussed, prior to August 21st, 1998, Rhodes and Thompson are discussing narcotics transactions. That's how it starts out. That's in this memorandum. We know that Rhodes is expecting consideration because he specifically asked for something up front. He says, look, I'll wear a wire but you've got to move me out of this jail. We also have an entire paragraph in this memorandum explaining exactly how Rhodes was soliciting information about the capital murder case. One of the most important notes that was turned over only in 2014 is the handwritten note. It was from page 2,184. It's also in our record excerpts. It's this note that appears to be from the second copy. You said he began his conversation with Thompson about, those conversations were about drugs. Yes, sir. When did it turn to the murder? I'll get to the timeline now. It's not abundantly clear. Here's what we know. Rhodes is in jail by June 10th or so. The murder of the complainants happens last day in April. Rhodes is in jail by June 10th. By August 26th, we have the note being handed to the DA's office. Originally, I had thought that this, or speculated that this note, which appears to be from Kelly Siegler, the first trial DA. It's also in our record excerpts on the last page. I'd opine that this original note was from August 13th, 8-13-1998. It talks about Robin Rhodes substantial narcotics transactions to recover the weapon. I started thinking about that. We know from the first trial that the weapon was recovered July 18th. It doesn't make sense that at that point, and this is from the record on appeal, it's 2201. I think it's more likely actually this note, and of course we didn't have a hearing in this case, so we didn't get to ask all these questions, that this note would have been from June 13th, 1998 because we know, A, it's on the note, that Thompson and Rhodes start out with substantial narcotics transactions. We know that starts that way. Then it appears he's working to recover the weapon. Thompson never disclosed the location, led to believe it's the same as the murder. The reason that Mike Kelly or Winkler might have been reaching out to Rhodes at this time period to help look for the weapon is Investigator Johnson already knew the location. Weeks had passed before they found that weapon. It doesn't make sense that you would have these notes in August after the weapon was already found. I apologize. I didn't figure that out until I was preparing for this last week and I was reviewing the timeline. We're not clear about the timeline, Your Honor, but it couldn't have started before mid-June. We know that as soon as Rhodes gets the note, we find the first inter-office memo random, which says prior to August 21st, we were talking about narcotics. Basically, we moved on to the capital case and now I've got this note for solicitation of murdering of weapons. Getting back to the agency question that you discussed, Judge Graves, I would point out that in U.S. v. Henry, there's no evidence that the informant was instructed to gather information from anyone in particular. In that case, the federal agents contacted the informant who was in the jail, who informed them, I've got some guys in my cell, and they said, well, just keep your ears open. He didn't even go as far as actually reaching out to the defendants and gathering information. Based on what we now know, and I'll be the one to send some blanks for us here, but based on what we now know, based on the inter-office memorandum, based on the contacted Floyd Gittin hand note, I think it's clear that Robin Rhodes is a government agent. At trial... Okay, and it's an all or nothing proposition in your view, then, because I still think somebody could be hired as an agent just in general and not be the agent for everything they end up doing. I mean, agency to me is a specific term, and if it's broader than that in this context, I'd like you to point me to the case that says that, because the thing about keep your ears open, then does kind of make you, if John is going to be in prison with Jake, and I say keep your ears open to anything Jake says, then he becomes a general agent on anything Jake says. I get that. But if John is simply a drug agent, you know, go find out about drugs, and then he expands that to start off on this solicitation of murder and all that, how does that make him my agent on that? That's my question. Just point me to the case that helps me with that. The first thing I would do is I would point out, Messiah, Henry, and Main versus Moulton, none of them have this idea that you have to be an agent for only one particular facet of investigation. As I pointed out, in Moulton, the agent was actually looking into this solicitation of a witness, allegedly, and according to the district court, but it was still a Sixth Amendment violation because they discussed the underlying capital. But I think for Fifth Circuit purposes, the case is Creel versus Johnson. That gives us our agency test, and I'm going to just use the relevant portions for our purposes. Was the informant reasonably led to believe he would receive a benefit first? Well, we know at this point, Robin Rhodes, based on all the records before the court, had been doing this for at least five years, had been very successful, and was always either getting benefits in his pending cases or money. And in his trial testimony, he specifically said, oh, I'm sure I received some benefit at the time. So I think it's pretty clear that he either received a benefit or reasonably was led to believe he had a benefit. In the DA's memorandum that was provided after 2014, he specifically asked for a benefit. He said, I'll wear a wire, but I want to be moved out of the Harris County Jail. Now there's a second part to that test from Creel, which is whether the agent acted pursuant to instructions from the state or otherwise submitted to state's control. The only direct evidence we have of instruction from the state is that the handwritten note, contacted Floyd, get in hand. But there's... But I don't understand how that proves that he was told in advance to go do this. I believe the problem would be, there would still be a six minute violation if Rhodes contacts Floyd Winkler, his handler, says, hey, I'm in here with Charles Thompson. And his handler then tells him, well, let's go ahead and see what you can figure out. You know, get something in hand. But are we sure that the get in hand is before the hit list? That note, I believe, was written after the first trial. So no, we cannot be sure about that, Your Honor. I think it's the only way that that statement makes sense. Because wouldn't get in hand be, if the prisoner is the construction, the state is arguing, of the get in hand. That the prisoner's got it sitting in his cell somewhere, and prison cells aren't a real good place to hold things. So go get that in hand, that hit list, because that's key. That would not be a messiah violation if it happened that way, putting aside the agency question. If Rhodes already had the hit list. If he already had it. And Floyd or somebody just wants to get that in hand. He calls him and says, hey, I've got a hit list. Well, get it to us. Here's why I don't think those are the facts. Okay. It's the DA's memorandum, once again. We know there's been conversation prior to the 21st. We know that. But we know no memorandum is ever made. We know no one ever reaches out until August 28th, the date, I'm sorry, 26th, the date of the memorandum was the day, or maybe the day before, whenever Rhodes got that note. So once he gets the note, and keep in mind, it's the hit list. It's the witness list with the fingerprint. It's used at the second trial. Once he gets that, all of a sudden, Mike Kelly has now made a report detailing that this has been going on for a while. So I think the get in hand statement, whenever you combine it with that DA's memorandum, shows us that the authorities were waiting on something. They wanted firm proof of what was going on in there. Now the fact that that dealt with this solicitation... There are two interesting lines. One of which, you send a man to find the gun. Now that's quite clear, because you're seeking evidence for a charged offense. Yes, Your Honor. And then when you move from that, and he comes up with a, well, I don't know anything about the gun, but I talked to him, and he's thinking about, he's soliciting me to find somebody to carry out a contract killing. Now when that is a distinct offense, to say the least, you can tie it back in, in the sense that trying to execute the witness against you is really just a continuation of the offense. But I still remain troubled by the basic concept which you normally had in LaSalle, that the violation is tripped, the liability wire is tripped by a solicitation, or an effort to discriminate the person jailed under a charge that he is serving. Right. And that's the level against him. As you move away from that, it gets, I have some trouble with it. And I'll be the first to recognize that the Supreme Court's guidance on these Messiah type violations hasn't been the most crystal clear. We haven't had a recent case telling us if the more specific Sixth Amendment police officer issues are the same as these Messiah issues. But I would point out, I'll point to Main vs. Moulton again. We know in that case, Main vs. Moulton, the informant originally started out, allegedly, according to the Supreme Court, a solicitation of a murder for a witness. Of course, they also discussed the underlying charge. The Supreme Court didn't parse those two things. The Supreme Court just told us there was a Sixth Amendment violation here, and because there was a Sixth Amendment violation, the evidence obtained from that violation cannot be used at trial. And then I would point out another case. It's Beattie vs. United States. It was originally a Fifth Circuit case. As long as you have the court violation, if in the course of that you gratuitously pick up a second one and you say that takes you, the specific charge limitation evaporates. That's my reading of all of the major Supreme Court cases on this. It would also fit with the Sixth Circuit cause number. In that case, we also had an informant where the informant was threatened himself by the defendant, a new offense, and also investigation into the underlying offense. It all happened with the informant. In that case, also, the defendant was offering all of the information. He was calling this witness, hey, come meet with me. He didn't know he was an informant, but he was saying come meet with me. And then when he comes and meets with him, he tells him all kinds of incriminating information about other guns that he had, other gun deals that weren't necessarily the offense that he was on indictment for, and he threatens that witness. I'm not sure how much precedential value it has, but the Supreme Court reversed it, the Fifth Circuit's case, simply citing Messiah. Okay. Unless you have anything else? You've saved time for rebuttal. Thank you, Your Honor. You've saved time for rebuttal. Thank you, Your Honor. Thank you. All right. And now we'll hear from Mr. Quenin. Quenin? Quenin. Quenin. Quenin. Quenin. Thank you, Your Honor. May it please the Court. I think there are three things to emphasize about this case. The first is, if you just look at the trial record, it's clear that the State did not cause Mr. Thompson to default his claims in State court. The second is, even looking at the new information, still none of it shows a Messiah violation. And the third is, Mr. Thompson's not going to be able to show prejudice because even without Mr. Rhoades' testimony, this jury was still going to hear about Mr. Thompson trying to have witnesses killed. I'd like to start, if I could, with the procedural arguments because I think that's ultimately the most straightforward way to resolve the case, putting aside the Messiah violation itself. And I think here, just looking at the record that was developed at trial, the State's alleged suppression of information was not the reason that Thompson failed to raise and develop his claims in State court. Thompson not only suspected, but his trial counsel had alleged and had evidentiary support for his claims years before Mr. Thompson came to Federal court. And you can just look at the Messiah elements that my opponent talked about in the opening, the right to counsel as attached, the defendant solicited by a government agent for information without his lawyer present, and that informant deliberately elicited incriminating statements. And just look at what defense counsel got out of Mr. Rhoades on the stand. You know, we know that... So you are agreeing there's a Messiah violation, you just think it's a cause and prejudice issue? No, we're not agreeing there's a Messiah violation. We think this case fails for multiple reasons. I think the easiest way is to say, just looking at what Mr. Rhoades said on the stand, there is a colorable claim to raise at trial, and it was in fact raised at trial. Just looking at the elements, you know he's locked up, you know Mr. Thompson has been charged with capital murder, you know that Rhoades has led Mr. Thompson to believe he could find people, got incriminating info turned over to his investigators, and we know that he was a full-time paid informant and got up to $30,000 for his information in one case. And all of that was elicited at trial. And that ticks the boxes for at least pursuing a Messiah claim, and that's why trial counsel made the objection, and that's why when all the elements are there, and Mr. Thompson is still making the same argument, he's still saying, page 22 of his reply brief, that because this person, Mr. Rhoades, was a full-time informant, he was a state agent, full stop. So, you know, in that posture, what I think E2 and Cause and Prejudice say is... So the state habeas counsel should have done what the federal habeas counsel did and pursue that stuff and would have found out whatever information they have now and been able to raise it in the state court for better or for worse, is what you're saying. Well, what... Because I think the middle of trial is kind of a bad time to have to be pursuing some totally new line. So I agree with them that to the extent they found out from cross-examination a bunch of stuff at trial, I'm not sure, I mean, I know they'll make the argument, they do what they can do, but I'm not sure that would win your day. But, of course, there's a state habeas after that and many years of stuff, and so why not raise it then, I think, is your point. Right. That's absolutely right. I mean, really, we're not really here to decide what trial counsel should have done and investigated in the first instance. I mean, we're talking about years later when it's now state habeas counsel's turn to say, hey, I've done my diligence, I've gone through the record, I've seen this claim was raised, am I going to choose to try to develop it and present it in state court like the state rules require me to, or am I going to let it slide for some reason? I think we're in the latter category here. Sure, there are some times when a lawyer filing a state habeas application, maybe he just doesn't even know that there's a claim out there, doesn't even know to suspect it, but we're so far beyond that in this case based on this record and what was available. And that's essentially what the state court found in denying the subsequent habeas as an abuse of the writ because the argument there was we couldn't have found this before, and they denied it. Now, I'm not saying we necessarily have to defer to that. I'm just saying that they did find that implicitly. I think so, but also it's significant in what that says, that it's an abuse of the writ, which means this claim could and should have been presented in state court according to the state's procedural rules, and that's what cause and prejudice is all about. But 110715A has a provision that would allow for if you just woke up one day and found out, oh, my gosh. I mean, let's say Rhodes had never said anything about being a foreman. He never just was completely covered up, and they were like found this out just accidentally one day. That would be a different fact pattern to present to the state, and they would have perhaps prevailed on the subsequent habeas there. Maybe. I can't play out all the ways that. At least getting permission to proceed on it. At least take what you have to state court. Comply with the procedural rules. Ask for the evidentiary hearing on that claim because, after all, that's where E2 is supposed to channel the fact development. Put it in state court. Give the state court your argument that because this guy had gotten $30,000 in one case and said he was a full-time informant, say that that makes him a state agent. Say that that makes a messiah violation. Ask for that extension of the law. Okay, but this is where the Brady comes in, and this is a concern that I have. I realize that not every omission by a prosecutor in turning something over the defense justifies a federal habeas. I'm not suggesting that. But it does seem like there was information that was held back for 16 years. Why? And is that something, I mean, does the state then sort of win by its own wrongdoing if we were to deny the habeas relief? No, Your Honor. That's a troubling implication that the state is trying to somehow advance wrongdoing as a basis to win. We're certainly not advocating that. But the elements of Brady do matter, and we're talking about whether the evidence is exculpatory or impeaching. Looking at that, I mean, these notes that we've heard about from my opponent, I mean, these notes are not obviously exculpatory or impeaching. As far as suppressing evidence, well, it's not clear that you can even suppress anything that's in the public record or that the essential facts are already known to your opposing counsel. And there's still a materiality problem. And putting aside all the potential concerns about specific pieces of evidence maybe not coming into a record soon enough for Mr. Thompson's liking, materiality is always going to be a problem in this case because looking at those handful of documents that my opponent is relying on and this contract, they do not get you to a Messiah violation. It's certainly not any more than what Mr. Rhodes said on the stand. You agreed there was a contract and you got a written contract. Yes. When did the contract end then in your mind? Contract ended by its own terms eight months after it started on November 1993. The whole contract lasted a mere eight months, and it's transactional. You're going to work off this case in exchange for a drug bust that leads to three grams or more of cocaine seized. If there's some allegation that this person was a full-time, open-ended, roving informant, if anything, that's going to come from him saying, I was a full-time informant and I got $30,000 for testimony in one case. It's not going to come from that contract. Well, and is there any other? I mean, other than his own testimony at the trial, which is certainly not hidden, is there any other evidence that he was, in fact, a full-time informant? In other words, have we learned something new in the ensuing years that shows something more than what he said on that? So we're not, again, to be clear, we're not conceding by any means that because he said he was a full-time informant, he was a state agent. But on the record question that Your Honor just asked, Mr. Rhodes talked about his testimony in the Stevens case in cross-examination, and federal habeas counsel admits that you could go to the record, in the Stevens case, and see Mr. Rhodes say in his own words that he was an, quote, employee of this task force in the DA's office and that the task force work was his, quote, primary source of income. Well, I'm not asking the question, Will. Other than his own perception of himself, which does not prove agency, me saying I'm your agent does not make me your agent. We've got to have something from you for that to happen. At least that's my understanding of agency law, and I hope that's right. So other than his own testimony, his own representations in the Stevens case, elsewhere, what other evidence, and then we have this contract that by its own terms had expired, what else proves that he was an agent of the state? Certainly nothing that I'm aware of. If Your Honor is asking beyond his own statements. Right, but because his own statements are known to everyone, so that can't be a reason for cause and prejudice and all that. What he said at the very trial that we're supposed to be reviewing for questions of habeas, right? Right. So that seems to be the best evidence, frankly, of the Messiah violation is his own testimony, not a bunch of other people that suddenly produced, other than that one contract which had expired, producing contracts, producing a bunch of stuff from prosecutors showing that this guy is some special informant for everything. That's right. No smoking gun that shows that he was put in that prison to get information from Thompson. I mean, none of that. None of that. Has come forward. So if it exists, it's still hidden. It has never come forward. I would push it back against that characterization about it being still hidden. Just to my knowledge, based on all the briefing and the record that I've seen, the stuff about Mr. Rhodes being a full-time informant, that's all the stuff that was known. That's the most known part of this trial. And that comes from him. That comes from him. So if we're trying to figure out whether the principal who hired the agent agrees with that, all we have that was not previously known was this contract. I think that's right. As we've said several times, it was a drug contract and was limited in time. I think that's right, and I think that's why there's clearly no cause and prejudice to overcome the default. Okay. But their position is that if we do get, so I understand the cause and prejudice. If we do get, well, there's one other thing, this in-hand thing, the get-it-to-Floyd get-in-hand that we just discussed. Yes. That could be evidence if, in fact, he didn't yet have the hit list and he calls up the police or calls up the prosecutor, talks to people, and they say go get some evidence, then he would become their agent, and that would not have been known without those notes. So what do we know about this get-in-hand note? It's kind of hard to make heads or tails about this get-in-hand note. I mean, it's one line on a piece of paper, ROA-2184. It's certainly not on its face inconsistent with what Rhodes said and what the investigator's memo said, which was Mr. Rhodes tried to get as much information as he could before he contacted the authorities to say, hey, I've got this information and I've got this hit list. I think the timing matters, and there's nothing from either ROA-2184 or 2201 or the investigator's memo that would say that what Mr. Rhodes said on the stand was untrue. There's no smoking gun, and that's always going to be a materiality problem. Okay, so let me ask about that. It also says wired on, going to wire dollars. He was never wired, was he? It said wired on or going to wire dollars. It's not clear whether. I think what that's probably referring to is some sort of solicitation plot to send somebody dollars. Right, but, I mean, in other words, he never. We have no evidence, unless you consider this get-in-hand to be that, that he was ever directed to go and get more information. Having solicited the information on his own for whatever reason, he was never asked to go back and get some more that we can find evidence of unless we construe contact of Floyd get-in-hand that way. Is that fair? That's correct. So the wiring does not refer to him wearing a wire and going and getting information. No, but even if it somehow did, I don't see how that would be relevant because by the time anyone's talking about wearing a wire or anything like that, Rhodes has already come to them with all the information in the hit list. Well, if he'd gotten the wire, that stuff might have then fallen under Messiah. If we count that solicitation as one cause of action and not the two causes of action that I started the original questioning with. It may be. I mean, maybe some parts of it are closer questions, but I think here, and Judge Higginbotham, you referenced this a few times in the opening part of the argument. This is clearly a distinct offense from the capital murder, from the initial solicitation plots, because there were a lot of murder solicitation plots here. They're a little bit hard to keep straight. But this time, remember on this most recent time, the third time, now Investigator Gary Johnson is now on the list of people to be eliminated. This is the investigator who testified at the first trial. Do we know that? Okay. On the contact if Floyd get in hand, tell me your conclusion. What does this mean? The most natural reading to me is this is a note that would say, Mr. Rhodes has contacted Floyd, and I, the author of this note, need to get that information in my hand. And I think my opponent is asking the court to look at this note in the context of other notes.  It tracks that exactly, and it tracks what Mr. Rhodes said happened on the stand. He said, I talked with Mr. Thompson. He then gave me this hit list, and I took that information to the authorities. So I think that's the most natural reading. There's certainly nothing in it that would just be overwhelmingly obvious that that's not the right way to read it. And so there's always a materiality problem, especially when you're talking about why did State Habeas Council not develop and pursue this claim? Because if that's all that State Habeas Council could really add to it, you really can't fault State Habeas Council for maybe thinking that's not the strongest argument to be making. But still, if he wants to make it, make it in state court. There's no reason to wait until federal court. Now, there's a second part of it that I haven't had a chance to talk to yet. If you look at the opening brief, there's some suggestion that there was an open file in the case. If you look at volume two of the reporter's record, page five, that's the citation they give. The prosecutor says, I'll have an open file, but it's not going to include my notes, and it's not going to include work product. So we're just not in a situation where State Habeas Council could reasonably say, well, I just had no idea that there might be prosecutor's notes that I don't know about. We certainly don't think that they are material, but I think that's an additional problem for this type of claim in explaining why you haven't pursued the claim diligently in state court. And also, just before, on the eve of trial, there's a colloquy about Mr. Rhodes where the trial court tells the prosecutor and defense counsel what's going to happen with the Rhodes situation. The defense counsel is told, there's another prosecutor in my office. He's got the information you're looking for. You can have a discussion with him. And defense counsel objects to that, thinks he has no obligation to confer with anybody. Under Brady, State should just hand over information to him. Court says, okay, make your prosecutor available for him to have a talk, and everyone seems to have left it at that. So, again, if there are any possible concern about Brady or what information wasn't known, the time to develop that, the time you're on notice of those claims, the time to develop the record for those claims is in state court. So I do want to turn back to the merits of the Messiah violation  It's this two-part test where it's not enough to show that somebody was led to believe or actually received benefits in exchange for soliciting information from the defendant, but you have to also have acted pursuant to the instructions from the State or otherwise submitted to the State's control. And we're not saying that Mr. Rhodes had to be specifically instructed, go get information from Mr. Thompson. But I think the case law shows that there has to be at least some level of State involvement, ex ante, and that the scope of agency absolutely does matter. We cited a case in our brief. So what is your rule for that? What involvement does the State have to have to suffice for Messiah purposes? I think the best reading of the case would be something like the State has to at least, at a minimum, have created the situation that led a, quote, full-time informant to get information from the defendant. And that's completely missing in this case. You mean put him in the same cell or something like that? Maybe something like that. But, you know, if you look at the Federal Habeas Petition, petitioners are still just speculating that that happened. There was some suggestion that Mr. Rhodes had been in jail with Mr. Thompson from June 1998. I think that's probably just a typo on my colleague's part. He actually was booked into jail in July of 1998. Rhodes was? Rhodes, yes. It was a parole violation, a motion to revoke parole. He's booked into jail in late July 1998. I think that's ROA 1511. So late July 1998, he's booked in jail. And then he, I guess, is encountering Thompson in the rec yard where they're having their recreation time together. They have these conversations and they lead to Thompson asking Rhodes to commit capital murder by killing witnesses and giving this hit list. But, again, nothing on the face of any of these documents is remotely inconsistent with what Rhodes said on the stand, which was, nobody directed me toward Thompson. I did not do any of this at the state's behest. And that has mattered in these cases. That's a key factor because regardless of prior involvement with the state about being an informant, the courts have just treated these sort of lay informants differently than cops or undercover cops. And there is that understanding that sometimes these informants will act entrepreneurially and they will understand that information is valuable. They'll try to get as much information as they can and they'll try to hand it over. And that's why the piece that's missing is some level of instruction. And when you have an undercover cop, I mean, that's the easiest part because a cop doesn't just find himself among inmates. An undercover cop isn't going to be able to say, oh, well, I just was having fun. Right. I get that. Yeah. But that's why I think the scope of the agency matters. Like in the Watson case we cited, it was a D.C. circuit case. There you had an actual informant who had been working with the DEA for two years and then some new information falls into his lap that's outside the scope of that agency. And he's found to be acting on his own initiative, notwithstanding his history. The court had said we're not going to extend the rule of Messiah and Henry to a situation where there's no indication that ex-ante this person was either told or put in the same environment or the state did something to make this situation happen. And, again, since we're in this federal habeas posture, even if there is some concern about some plausible Messiah violation, that's not a basis for federal habeas relief because that would require extending the law. Under Teague, that argument, which may have been a fine argument to make in state court to ask the court to extend the law, will not justify relief here. And even on top of that, the thing about Mr. Rhodes being a state agent, again, I think is, if anything, that's where most of their argument is based on his prior history. And all of that was either the most known or knowable to trial counsel. If I could say a few words about prejudice, I think I mentioned before that there were multiple solicitation attempts. This wasn't the first or second plot. This was really the third. The very first one was with the Aryan Brotherhood member, with Maxie Humphrey, and Thompson had paid the girlfriend of Humphrey some money. There was a plot set up. Now, that led to the investigation that led to Mr. Johnson, I think. There's some overlap there, but there are clearly different people being solicited to kill witnesses. And then the third time with Mr. Rhodes, you've got even more witnesses added to the list. So we were talking about future dangerousness, and you've got somebody who's clearly from jail trying to reach out and have witnesses killed, and I don't think the jury needs to necessarily hear every detail of the plot and see every piece of paper to understand. One of the questions I have about the basic rule that the missile protects attorney-client privilege, an attorney defending a specific charge, and then when you move over to a much broader kind of a process, I have some trouble seeing what the constitutional violation is. Our whole plea bargaining process is geared toward obtaining all kinds of bargains. It's a bargaining process, and we have it for good or for not, and it has positive features and difficult features as well. But it relies heavily upon what the defendant can bring to the table. And a high percentage of the population in jail, I don't think we're aware of that. Everybody there is aware of that. And what do you do with that phenomenon when you talk about it in an obtuse way? I'm saying that we need some fairly defined rules, not to suggest to you the Supreme Court has offered some, and that is that you have to deal with a block-burger test and whether or not the attorney-client privilege has really been disrupted. The Supreme Court's reluctant to extend the attorney-client privilege into a blanket for a whole lot of other conduct. The right we're talking about here certainly is it's offense-specific, and I think you can break down what we're talking about into separate offenses. But I think the problem, the bigger problem is with the rule that my opponent's advocating, which is basically that— Well, okay, I'm the attorney. I'm defending my client of a robbery, and the state sends somebody in, and they solicit him, and they found out that he is guilty of a drug offense or something else totally unrelated. That doesn't frustrate my privileges. That's quite clear. That doesn't frustrate an attorney-client relationship. It's not a missile violation. However, when you now have a plea of guilty, and now a founding of guilty, right? The issue now is sentencing, broad-gauge sentencing. What is the jury going to consider in determining whether his likelihood of success? There's nothing more damning to a jury than a box to hear the evidence of solicitation of other murders, right? So I'm saying that in that it may be that you're looking at completely different offenses, but that evidence is really powerful evidence toward the punishment for the original offense for which the attorney was engaged. It's certainly powerful evidence, but I think all of these solicitation plots are powerful evidence. The prejudice standard for this missile claim is breadth, and he's got to show the substantial injurious effect on the jury's verdict. And in light of all the evidence that the jury was going to hear about him trying to solicit murder, the damage is done there. But just to step back, though, again, even without Rhodes, putting aside Rhodes, we're in this posture of why was this claim not raised and developed in state court? None of the arguments my opponents made really answer that question. They're focused on the underlying missile violation, but that's just the natural result of state procedural rules that require these claims to be developed in state court. You have a finding here that trial counsel effectively cross-examined Mr. Rhodes about his history with the state. You have Rhodes's own statements on the stand, which go far beyond the contract. They certainly go far beyond any of the handful of prosecutor notes that my opponent relies on. And the missing piece at the end of the day is that level of instruction. And without that, I think you're left with a rule where if informants understand that they can go get information and they do it once or twice, they have a history, you know, they understand how information is valued. You really have a troubling situation where their statements are now going to be in situations like this. I'll say it another way. It's quite clear when you get the information and find the gun. Now, that's clearly a missile violation. But really seeking evidence with a charged offense and so find the murder weapon, for heaven's sake. But then you're not talking about guilt or innocence. Now you're talking about the state conduct. Yeah, two things. You're talking about guilt or innocence. You're not talking about punishment, and you're not talking about other crimes that may be relevant and would be highly relevant for a jury to understand his other conduct. In other words, other conduct, which happens to be other criminal conduct, too. But it's for the purpose of punishment. Does that matter in this context? I see my time has expired. May I finish to answer the question? Sure. I think ultimately Rhodes' testimony is just on a different footing than Mr. Johnson's testimony. That level of state involvement is not there. This is testimony that the jury was entitled to hear and that they were going to hear about the solicitation attempts, so the court should affirm. Okay. Okay. Thank you. We'll hear rebuttal from Mr. Landers. I would like to discuss the procedural issues, the cause issue, briefly. First, I would point out it's not clear that 2554E2 applies. Everything here has been presented to the state courts. This is not an unexhausted claim. It's a procedurally defaulted claim. So I would point that out. In any event, if we read Tamayo-Reyes, we know that the standard for E2, the failure to develop standard, comes from the same cause, prejudice. Related to cause and prejudice, Banks v. Dredke and Stickler v. Green are the two main Supreme Court cases. And what both of those cases teach us are it's reasonable for trial counsel to rely on the DAs turning over Brady evidence, and if it's reasonable for the trial counsel to rely on them, then it's reasonable for state habeas counsel to rely on the DAs. But can't it become unreasonable at some point? And so if you didn't have any information about this guy being a full-time informant and he says, I'm essentially an employee of the Harris County whatever, then can you keep relying on, oh, gosh, I guess they would tell us if he was a full-time informant, oh, my goodness, when he says it himself. And, again, I'm not agreeing that he is, but he says it himself on the stand under oath. How can you all think, oh, well, la-di-da? Well, I would like to think that, yes, defense counsel can rely on DAs to turn over all the exculpatory evidence. Also, we have to look at the way this progressed. So from the habeas counsel's point of view, before the Rhodes trial, I'm sorry, the retrial, four days before testimony, trial counsel overhears the conversation with Rhodes. If you read the cross-examination, it appears he discovered a few things. Number one, I think he discovered the published Stevens opinion. He seems to cross on those four points mentioned there. I believe that the government, through Lynn McClellan, the other DA, disclosed some information about the Benavidez trial, where the $30,000 came from, because the Stevens opinion doesn't mention the name of that defendant. That seems to be the extent of everything, but it's not clear on the record where that came from. I know it because I've read the Stevens opinion, and I put it all together. But it's reasonable for a state habeas attorney to think to himself, okay, they must have turned that much over, and surely there's not more there. Because keep in mind, the state was ordering. Wow, so the state habeas counsel doesn't have to talk to trial counsel? The thing, oh, he should certainly speak to trial counsel. I mean, that's a first. We make them do all this elaborate investigation and Wiggins and all this stuff, but they don't have to talk to trial counsel? I think they should certainly speak to trial counsel. Okay, so trial counsel would have said, I found it by looking it up on Lexis or Westlaw, not because the attorney gave it to me. The question is, does state habeas counsel then have to go through, and I realize that I found this information, but the question is, does state habeas counsel have to go through all public records related to this person, and do they also have to figure out that Robert Rhodes is Robert E. Lee? Robin Rhodes is Robert E. Lee. That's where the break came in this case is when I found that dismissal in Robert E. Lee's file. Okay, and what exculpatory information did you find other than the 1993 contract and this get in hand, however that may be construed? And also the other handwritten note, which I think establishes a longer timeline. The 2201? I'm sorry. Yes, 2201. I just want to be clear, and I'm not going to argue with you one way or the other about whether it is exculpatory, but it's 2201. I think 2184 is the page with the get in hand and the 1993 contract. These are the smoking guns. That was what was disclosed. Yes, Your Honor. I believe they're all included in our appendices. But one thing I would point out is in both Banks and in Stickler, the state made the same argument. In Banks, there's a witness who's coached, and there's a witness who's kind of an undisclosed informant. In Banks, the defendant had a police officer from Arkansas come testify. That person was an informant for him and had lied during his duties. The same standard could have applied. Well, we know he's an informant. Now you need to go figure out is there more there. In Stickler, there was mentions. Okay, so in Stickler, the witness had this faulty memory, and it's never disclosed, and it's shirred up before trial testimony. And according to the state there, there's public records. There's newspaper accounts of her giving multiple statements. And the argument was, well, state habeas counsel should have found that. And I'll point out, although it's a different case, Williams v. Taylor, the 2254E2 case, there was suggestions. Had the defense attorney looked in all the public records related to the jurors, he would have found out the actual Brady violation in that case. All three of those cases tell us, whenever the state says they have an open file policy, which we have here, whenever there's withholding of favorable evidence, and whenever the state asserts in state habeas that the defendant has received everything, then we have cause. And I would point out in state habeas related to a different claim. But only if these allegedly exculpatory items are actually material. It needs to be prejudice. But I would point out in state habeas that the state wrote, the applicant fails to allege the specific information that could have been garnered had trial counsel had additional time to prepare for Rhodes cross-examination. They knew right then that within their file, maybe not the contract, but the notes related to Rhodes were right in there. And, of course, the information within the DA's office file should be impugned to the other prosecutors on the case. Okay. Thank you. We appreciate your argument. We appreciate both sides' arguments. And the case is under submission.